# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHGIAN
## SOUTHERN DIVISION

_____

**WIEBE BOER** and **JOANNA BOER,**

                               CASE NO. 1:24-CV-385

      Plaintiffs,                           Hon.

v.

**CALVIN UNIVERSITY**,

      Defendant.

_____

## COMPLAINT AND JURY DEMAND
_____

### COMPLAINT

Plaintiffs Wiebe and Joanna Boer, by and through their attorneys, Pinsky Smith, PC, and Cunningham Dalman, PC, state as follows:

### JURISDICTION, VENUE, AND PARTIES

1.     This is an action requesting the Court remedy Michigan common law breach of contract and defamation, and violations of the Elliott-Larsen Civil Rights Act ("ELCRA"), MCL 37.2101 *et seq.*

2.     The Court has diversity-of-citizenship jurisdiction over this action pursuant to 28 U.S.C. § 1332.

3.     Plaintiffs are husband and wife. Dr. Wiebe Boer was President of Defendant Calvin University until its Board constructively terminated him on or about February 26, 2024.

4.      Dr. Boer is a white male and a permanent resident of Atlanta, Georgia, in Cobb County. Ms. Boer is a Caribbean-American woman of color, and a permanent resident of Atlanta, Georgia, in Cobb County.

5.      The Boers established their residence and domicile in Atlanta, Georgia, where they purchased their permanent home in 2005. Since this time, they have periodically moved around the world for Dr. Boer's employment, but they always return and continue to intend to return to their home in Atlanta, which they consider their "home base." This is where their extended family, including Ms. Boer's immediate family, lives. Additionally, Dr. Boer retains a Georgia driver's license, their car is registered in Georgia, and the Boers still return for routine care in Atlanta, where their family doctors and other important professionals remain.

6.      No matter where Dr. Boer's employment has taken the family, they return to their home base for weeks and even months throughout the year, particularly in the summer. Ms. Boer and the Boer children have spent significant time there, including several entire summers and extended stays during several of Ms. Boer's pregnancies and other family events. She has also returned with the children to enroll them in school for extended periods at various times. The family even lived together there altogether during the COVID-19 Pandemic throughout most of 2020.

7.      Although the Boers and two of their children have been living in Grand Rapids, Michigan since Dr. Boer accepted the position as Calvin University's President, they have continued to frequent their Georgia home, where their living

quarters remain furnished, with clothing and other personal effects to accommodate their daily lives.

8.    Defendant Calvin University ("Calvin" or "The University") is a private university with operations in Kent County, Michigan, which is run by a Board of Trustees.

9.    The acts that are the subject of this action occurred in Kent County.

10.    The amount in controversy exceeds $470,000, exclusive of costs and attorney fees.

## FACTUAL ALLEGATIONS

*A.    Background*

11.    Calvin selected Dr. Boer to become its 12th President in 2022 after he beat out other candidates for the role during the Calvin Board of Trustees' ("the Board") selection process. Dr. Boer, who was an alumnus of Calvin, had been working in corporate industry, not academia as was more typical, in West Africa at the time the Board offered Dr. Boer the position.

12.    At the time of Dr. Boer's hire, Calvin had also interviewed its Provost, Noah Toly, for the President position, even though Toly submitted his application materials past the deadline. Toly engineered the inclusion of his cousin on the selection committee for the President's role to increase Toly's chances of the committee voting to pick him. In addition, Toly obtained a copy of the complete application packet of every other candidate prior to when he submitted his application – a leg-up in the process which no other candidate had.

3

13.     When the Board ultimately chose Dr. Boer, Toly was extremely upset about being passed over and made his displeasure known to Calvin officials.

14.     After Dr. Boer accepted the Presidency, Calvin and Dr. Boer entered into an employment agreement ("the Agreement"), which is attached at Exhibit A. Calvin also began an employment relationship with Ms. Boer as the "First Lady" of Calvin, and Calvin paid her a salary as an employee of the University for the execution of her duties on campus.

15.     The Boers moved their family halfway around the world, from West Africa to West Michigan, to begin their new roles in 2022 with Calvin. This move included their two school-age sons who still lived at home. The Boers moved their family into the DeWit Manor President's residence on campus, which Calvin required and provided as a housing benefit to him under the Agreement. Further, the Boers enrolled their sons into private Christian school, as required by Calvin under the Agreement.

16.     The Agreement also required Calvin Board members to make introductions for Dr. Boer to the local corporate community. Dr. Boer felt that this was crucial to success in his role as Calvin's new President, and he also knew that he would want to serve on corporate boards later in his Presidency and into his eventual retirement. However, despite Dr. Boer's polite reminders about these introductions to Board members, they failed to make efforts to facilitate these connections as specified in the Agreement.

17.     Dr. Boer dove into the role of Calvin's President with what many

described as great energy and vision, the likes of which Calvin had not seen in quite some time. Similarly, Ms. Boer embraced her new duties on campus, and maintained a full calendar of meetings, events, and public appearances.

18. Both Boers made it a focus during their time at Calvin to provide greater support and inclusion for students, staff, and faculty of color on campus. Like Dr. Boer, Ms. Boer had also attended Calvin as an undergraduate student. As a woman of color who had immigrated to the United States, Ms. Boer often felt marginalized when she was a Calvin undergrad and not like an equal part of the Calvin and West Michigan community. Dr. and Ms. Boer were determined to lead Calvin to a place of greater diversity, equity, inclusion and belonging, better in line with the Christian values that Calvin claims to espouse.

19. The Boers also made significant efforts to increase the international profile of Calvin. Those efforts were successful and resulted in boosted enrollment of students from outside the United States and greater international donor support for Calvin. These efforts were critical for many reasons but ultimately for Calvin's future survival, since at the time that Dr. Boer became President, Calvin's student enrollment had declined annually for more than a decade.

20. Another area where Dr. Boer led Calvin into different recruiting strategies was returning to a greater number of local schools. When Dr. Boer was hired, Calvin had not recruited at Ottawa Hills High School – the closest high school to campus – in more than two years, nor at Grand Rapids Public Schools generally. Calvin had also largely ignored the less affluent areas of the east side of

the state, and Dr. Boer felt that all these areas where Calvin had stopped spending time to recruit were untapped resources for attracting students interested in a Christian education. Further, Dr. Boer felt that certain strategic decisions, based in stereotypes about where Calvin would find high achieving students who might choose a Christian education, were hurting the campus community on a number of levels. Dr. Boer sought to take Calvin into the future by addressing what had been a skewed lack of diversity among the student body, maintaining healthy enrollment numbers needed to sustain operations, and seeking achievement and potential everywhere.

21.    Some community leaders told Dr. Boer to "watch his back" because they said there were those who would greatly dislike Dr. Boer paying attention to communities which included higher concentrations of people of color and had been traditionally ignored by Calvin.

22.    At the time Dr. Boer became President, Calvin had also been struggling financially for some time, more so than the campus community— particularly donors— realized. This was at least in part due to declining student enrollment before Dr. Boer's arrival.

23.    Dr. Boer also approached donor relationships in a new and different manner than was traditional at Calvin. He chose to actively listen to their concerns, ideas, and visions for Calvin. In this way, Dr. Boer tried to benefit from the expertise of successful people who cared about the campus, but he also worked at creating a shared investment in Calvin's goals with its donors and potential

contributors – instead of merely just dogging them for donations as the focus of their contact with Calvin leadership.

24.     Another challenge for Dr. Boer was the state of Calvin campus morale when he took the helm. A "Best Christian Workplaces" survey done in spring 2022 shortly before Dr. Boer's arrival showed faculty and staff morale so low that the ratings were below the charts. This was both a concern generalized to multiple areas of campus operation but also included various complaints about Provost Toly's heavy-handed style of leading faculty.

25.     Dr. Boer later learned that multiple female members of faculty (past and present) accused Provost Toly of unlawful sexism in a wide variety of resource and other decisions falling within Toly's extensive power and purview as the Provost. Dr. Boer was troubled by the complaints when he reviewed the evidence, and he considered initiating a formal discipline process and possible termination of Toly's employment. But a handful of faculty and Board members supported Provost Toly and convinced Dr. Boer to keep him in the role, and work with him on improvement, since Toly had a great deal more experience with academic bureaucracy than Dr. Boer did. So Dr. Boer engaged two different executive coaches for the Provost.

26.     Dr. and Ms. Boer also spent considerable time on the campus morale problem in other ways. They hosted regular events, formal and informal initiatives, and "listening sessions" with various groups of students, staff, and faculty all over campus and in their home in DeWit Manor. They felt that fostering regular

7

connection on Calvin's campus was needed and necessary and undertook that mission with great zeal.

27. Faculty have described Dr. Boer's leadership style as personal and informal, often focused on people and connections — not all business, which was a change from some of Calvin's other administrative officials. It was a regular occurrence, for example, to hear from Dr. Boer directly by text message or to meet about an item of campus business while watching a sporting event. This represented a significant culture shift at the top in business as usual at Calvin.

28. Under Dr. Boer's leadership and the efforts of both Dr. and Ms. Boer, Calvin thrived, experiencing increasing student enrollment, better donor relationships, and a healthier financial outlook.

B.   *The Constructive Termination*

29. On Thursday, February 22, 2024, upon his return from an overseas trip with Calvin donors, Dr. Boer met with Calvin Board Chair Bruce Los, Board Secretary Gene Miyamoto, "Safer Spaces" and Title IX Coordinator Lauren Horras from Calvin Human Resources, and Board Vice Chair Mary Tuuk Kuras, who appeared by video. When Mr. Los asked to have the meeting with Dr. Boer, Los gave Dr. Boer no indication what it was about, nor did he provide him any written notice of any concerns in advance or during the meeting.

30. Horras read a prepared script in the meeting, informing Dr. Boer for the first time that an employee of a contractor that Calvin uses to work at official events at DeWit Manor ("Complainant") made accusations against him. Calvin

8

advised that Complainant was not a student, faculty, staff, or otherwise associated with the Calvin campus. The accusations concerned texts between Dr. Boer and Complainant, plus other issues Calvin has since ignored as they have proven unfounded, unproven, or otherwise immaterial.

31.     Dr. Boer, stunned by the allegations, acknowledged texting with Complainant but did not agree that the texts were unwanted or inappropriate. He shared that Complainant had actively participated in their discussions (which took place over approximately three weeks total during and around January 2024), and she had approached him in public—never indicating discomfort. There was nothing sexual about the texts. As Dr. Boer told the group, most recently, Complainant had texted Dr. Boer that Complainant had taken a copy of a book he had written from DeWit Manor (without permission) when she had been working there, and she asked him if he would autograph it for her. It did not appear that the group who presented the accusations knew this information before Dr. Boer informed them of it.

32.     The group who met with Dr. Boer on Thursday, February 22 indicated they had known about and/or investigated the complaint for approximately two weeks prior.

33.     They issued Dr. Boer a "Directives List." In that list, Calvin instructed Dr. Boer, among other things, that:

- He was expelled from campus anywhere outside DeWit Manor.

- A statement would be made to all staff that he was out for "personal reasons," even though this was inaccurate.

9

- He was under strict prohibition from contacting anyone in the Calvin community, including the Board. He was permitted to contact only "immediate family" and one "trusted advisor."

34. The Directives List threatened Dr. Boer with "immediate termination" for violation of these rules.

35. On Friday, February 23, 2024, Los and Miyamoto told Dr. Boer they believed they had grounds to fire him. Dr. Boer continued to contest that his actions were inappropriate. He said this was over dramatized and was either a misunderstanding or the Board was misled.

36. The following day, Saturday, February 24, 2024, as instructed, Dr. Boer attended a video meeting to address the Board. He had no information about what the whole Board had been told. Dr. Boer was given 15 minutes to address the allegations. Dr. Boer acknowledged it was a mistake to text Complainant (particularly considering how Complainant perceived it) but continued to deny other unprofessional or inappropriate conduct. He offered to undergo any Title IX or other necessary process to clear his name.

37. Dr. Boer shared more about texts Complainant sent him and Ms. Boer after having had some time to consider the accusations against him. Dr. Boer told the Board that Complainant had initiated friendly texting with Ms. Boer as well, which the Board members did not seem to know.

38. When Dr. Boer's 15 minutes were up, that was the end of his participation. Board members were not allowed to ask questions or engage in any discussion with him.

39.     The Board has since acknowledged that there was nothing sexual about the text messages and that Dr. Boer committed no Title IX violation in communicating with Complainant.

40.     Upon information and belief, most of the Board of Trustees have not actually seen the text messages in question.

41.     Hours later on Saturday, February 24, Los called Dr. Boer, claiming the Board had the votes to fire him. Los said Dr. Boer could resign if he would prefer, in which case Calvin would provide Dr. Boer a chance to influence the public statement about the allegations that Los said Calvin intended to release. Los said Dr. Boer had to decide before the 7:00 pm vote that night that the Board planned, which Los represented would result in termination.

42.     Believing Los's claims, Dr. Boer asked for a second chance and asked in the alternative to resign for "personal reasons" to spare himself and Calvin publicity on these allegations and the resulting conclusions about them, which he vehemently disputed.

43.     The Boers selected a "community advocate," per the "Directives List": a former Board member and family friend. She, too, was completely perplexed by the Board's strong reaction and apparent desire to rush to termination. She asked to speak with the Board, which Los would not allow.

44.     Then Los contacted Dr. Boer and moved up the deadline by which he had to decide about resignation to 5:00 pm, instead of the previous 7:00 pm deadline. Los told Dr. Boer he was running out of time and needed "to think about

how this would impact his family." Finally, at 4:55 pm, Dr. Boer called Miyamoto and agreed to resign.

45.     On Sunday, February 25, 2024, the Board approved a request by Ms. Boer to be heard on the matter, since Calvin also unceremoniously terminated her employment without so much as a conversation. Ms. Boer and her "community advocate" videoconferenced with Los and Kuras. Kuras confirmed the main allegation against Dr. Boer was the texts he had exchanged with Complainant but refused to discuss them in detail. Kuras told Ms. Boer that the Board decided to not do a Title IX investigation, insinuating that it was a kindness to the Boers—with no input from them.

46.     Calvin's stated reasons for the expediency for all of this have fluctuated, from concern that the Complainant's husband posed a physical threat to the safety of the Calvin community, to wanting to appear proactive with what the Board viewed as a delicate situation. To date, Calvin has provided no good or logical reason for the rush and the secrecy involved with the lack of appropriate investigation, nor for a decision-making process which violated its own policies and may have also violated the law.

47.     That evening, still Sunday, February 25, Dr. Boer was advised the Board intended to issue a statement the next day about Dr. Boer's resignation. Dr. Boer learned later that the Board had already started communicating with various campus community members about his separation Sunday night, indicating there was never a true intent to give him input in the public statement.

48.     On Monday, February 26, 2024, Dr. and Ms. Boer met with a trauma counselor—who told them they should (and had the right to) consult legal counsel. The Boers struggled to retain a lawyer with the necessary expertise on short notice, given the speed with which the Board acted, but eventually they were able to hire the law firm of Pinsky Smith to provide legal representation later in the day on Monday. Also, up until that point, the Boers had been following the "Directives List" from the Board and had not spoken to anyone other than their "community advocate" about what was happening. Until Monday afternoon, Dr. Boer had no legal counsel, access to Title IX expertise, or any professional guidance in his defense of the accusation.

49.     That afternoon, on still on February 26, 2024, Calvin unilaterally issued a misleading, vague, and unnecessarily damaging public statement (the "Statement"), denying Dr. Boer and his lawyer any input even after he had been promised that he would have input if he agreed to resign in lieu of termination.

50.     The Statement began by alleging that Calvin takes reports of inappropriate conduct seriously. It then stated, in part:

> Calvin University recently received a report alleging that President Wiebe Boer engaged in unwelcome and inappropriate communication and attention toward a non-student member of the campus community. The report did not include allegations of sexually explicit communication or physical contact, but the alleged conduct is concerning and inappropriate.
>
> Upon receiving the report, we immediately engaged outside experts to ensure that Calvin University responded to the report in compliance with our policy and legal requirements, including Title IX. After being notified of the report, Dr. Boer denied some of the allegations but did admit to sending communications that were inappropriate and inconsistent with the high

13

standard of conduct and character expected of the President of Calvin University. Dr. Boer subsequently offered his resignation, which the Board accepted.

While we understand the desire to know more specific information, as a Board, we have an obligation to maintain the integrity of our Safer Spaces policy, comply with Title IX and uphold our ongoing commitment to support the complainant. Due to employee privacy considerations, neither Calvin University nor any of its representatives will provide further comment.

51. The references to Title IX imply that the allegations implicated Title IX and, more importantly, that a Title IX process was afforded to Dr. Boer – which was false. If Title IX had been implicated, Dr. Boer would have been afforded significantly more protection and due process. By referencing Title IX, the Statement implied that Dr. Boer was afforded Title IX due process protections, which was untrue.

52. Calvin's Safer Spaces policy applies to sexual misconduct committed by or against a member of the Calvin community. By referencing the Safer Spaces policy, the Statement implied that there were allegations of sexual misconduct, which was untrue.

53. The Statement instigated significant speculation and harmful false conclusions about Dr. Boer. One day after Calvin published the Statement, graffiti painted the following on campus: "Justice for victims of Boer's of sexual harassment." Of course, Dr. Boer was not found guilty of or responsible for any such conduct. Indeed, the Board itself concedes there was nothing sexual about the texts. Yet, Calvin's Statement indicated the contrary.

54. Upon information and belief, Calvin has video evidence relating to those who placed the graffiti on campus falsely accusing Dr. Boer of sexual

harassment, but it has done nothing with this evidence to investigate the perpetrator(s), or refer the matter to law enforcement officials.

C.     *Negotiations Break Down*

55.     The Board's lawyer initially advised that Calvin would make a severance offer to Dr. Boer if he was cooperative and did not make public statements about the circumstances of his resignation. After rushing the resignation/termination process, the Board then went silent and made no severance offer for 9 days, leaving the Boers in complete limbo.

56.     Eventually, the Board made an offer of severance to the Boers, including a requirement that the Boers move their belongings out of DeWit Manor by April 15.

57.     The Boers countered, asking for additional time that would allow their minor children to remain in stable local housing until the end of the school year—along with counteroffers on the other settlement terms beyond housing as well.

58.     Calvin has made various vague demands that the Boers immediately leave the DeWit Property. Since that is not practical, particularly since the Boer children are still enrolled in school in Grand Rapids, per the employment agreement, and it takes time to find a new place to live and move an entire household in the middle of the school year, Plaintiffs' lawyers tried to negotiate with Calvin's representatives the date and details of the Boers leaving their home at the Property, to no avail.

59.     With respect to the Property, Calvin's representatives stated that part

of the reason they wanted the Boers to leave their home immediately was because Calvin officials were monitoring them on the security cameras on the Property, and they could see that various faculty and staff had come by to visit and check on the Boers. Calvin officials stated that they felt that the Boers were "whipping up" support and did not want that to continue. Plaintiffs both felt greatly unsettled to know that Calvin officials had monitored and surveilled them and their family in this fashion.

60.     After the Boers made a counteroffer to the Board, the parties entered mediation. Despite having nearly a week to consider and contemplate a response to the Boer's counteroffer, the Board did not respond substantively with another offer until nearly 8 hours into the mediation.

61.     Ultimately, after mediating for more than 16 hours, the parties failed to reach agreement. After exchange of multiple offers, Calvin rejected Plaintiffs' last counteroffer and declared that it was no longer negotiating.

62.     Plaintiffs left for a family vacation on Wednesday, March 27, 2024, and Calvin officials were aware of this.

63.     While Plaintiffs were on vacation, on or about Tuesday, April 2, 2024, Calvin officials entered the Property without invitation by or permission of Plaintiffs, and changed the locks so the Boers would not be able to reenter and live in their home when they returned.

64.     The Boers' nephew, a student at Calvin, had been staying at DeWit Manor while the Boers were on vacation, and he came back to the Property on April

16

2 after being gone for part of the day to find that the locks had been changed, with his personal belongings still inside and inaccessible.

65.    Despite attempts by the Boers' attorneys to negotiate their return to live in the home and an agreed-upon move-by date, Calvin refused to negotiate Plaintiffs' unrestricted return to the Property in which Plaintiffs have legal rights as tenants, unless Plaintiffs signed a waiver of those rights and agreed in writing with Calvin's incorrect legal position that they do not have lawful status to be in the home as tenants. Calvin continued to refuse the Boers unrestricted access to the Property and to live in the Property.

66.    On the evening of Sunday, April 7, 2024, the Boers returned from vacation, and Calvin permitted the Boers to enter the Property only briefly with a human resources employee and campus security escort for the purpose of retrieving a few personal belongings. Calvin only permitted one member of the Boer family to enter the home at a time to retrieve belongings to go to their temporary housing and prepare for the children to return to school the following day.

67.    Calvin officials even restricted the Boer children to entering the home one person at a time on Sunday, April 7, 2024, to retrieve some personal belongings to take to their temporary lodgings. The Boers' youngest child, at nine years old, was too unsettled to enter the home without one of his parents, since Calvin would only allow him too to go in the home escorted by a uniformed campus security officer. Because each individual of the Boer family was required to enter the home alone, it took over an hour for the Boers to collect basic items on Sunday night. The

Calvin employees there to supervise the Boer's access saw the distress and tearful emotion this process caused the Boers, and they lamented that they were unable to do anything differently without Calvin deeming them to be "insubordinate."

68.     The Boers are staying with friends until they can secure alternative housing and set up and move their furniture and basic belongings for their family in Grand Rapids, so their sons can finish the school year.

D.     *Additional Actions By Calvin's Board of Trustees*

69.     There have been repeated instances of inconsistencies and inaccuracies in statements from the Calvin Board of Trustees Executive Committee.

70.     For instance, Calvin's lawyer indicated one of the reasons for the rushed "investigation" process conducted by the Board's Executive Committee was over concerns of a potential "active shooter" situation, allegedly spurred by the Complainant's husband, who was reportedly upset by the texts between his wife and Dr. Boer. Meanwhile, Board Vice Chair Kuras assured Ms. Boer personally that there were no safety concerns driving the speed of the process against Dr. Boer.

71.     Also, Calvin has alleged the existence of two other complainants who have spoken out about Dr. Boer, seemingly trying to create the inference of a pattern in his behavior. Upon information and belief, Calvin officials have spread rumors of the existence of other alleged complainants against Dr. Boer. However, Calvin and its lawyers refused to provide detail on the allegation of other complainants during negotiations with Plaintiffs' counsel. Upon information and belief, it is false that there are others who made allegations against Dr. Boer to

Calvin as part of the "investigation" into Complainant's report.

72.    Los and Kuras also presented the results of their "investigation" against Dr. Boer to the Board in greater detail once various donors and other campus constituencies began to complain and ask probing questions about the lack of process leading to Dr. Boer's constructive discharge. Upon information and belief, these reports of their "investigation" have contained allegations which are untrue.

73.    Los and Kuras then asked the Board to affirm the decision to constructively discharge Dr. Boer after Dr. Boer protested the defamatory Statement Calvin published about him and donors began to call for a third-party investigation of the Board's actions. Unsurprisingly, after only a presentation by Los and Kuras, the Board voted to affirm the decision to constructively discharge Dr. Boer.

74.    Calvin, specifically the Board of Trustees as led by Chair Los and Vice Chair Tuuk Kuras, has diligently continued and perpetuated a harmful narrative about Dr. Boer to the campus and local community, irrespective of truth or fairness. Meanwhile, they have continued to allege to the public that they are providing care and assistance to the Boer family, which is false.

75.    Calvin, specifically the Board of Trustees as led by Chair Los and Vice Chair Kuras, has adamantly demanded silence and confidentiality from the Boers, blaming them for donors and the campus community raising significant questions and concerns about these events. Meanwhile, upon information and belief, Los, Kuras, Horras and other Calvin officials have taken every opportunity to share

their view of the situation, including one-sided, biased, and unreasonable conclusions they have drawn throughout the ordeal. They tout anything they believe supports their narrative, then hide behind the need for "confidentiality" when faced with inconvenient questions or truths.

76.    Even during the Parties' extensive mediation, in which both sides were allegedly engaged in good-faith negotiation, members of the Board of Trustees were meeting with influential faculty who had expressed concerns and questions about the Board's handling of the matter, with the express purpose to "share additional information about the reasons for and process behind our recent leadership transition."

77.    In fact, upon information and belief, Calvin has been singling out and having repetitive meetings with faculty who have expressed concern about the Board's actions with respect to Dr. Boer's constructive discharge, even to the point that some faculty have felt that their continued relationships with the Boers may threaten their job security.

78.    Calvin's Board of Trustees has repeatedly refused any independent review of the Board's actions with respect to Dr. Boer's constructive discharge. Instead, the Board has insisted that its after-the-fact ratification vote was part of its own adequate "internal review." Of course, it means nothing that the Board assured itself in an "internal review" that it handled the situation appropriately.

79.    The same day the Board rejected the Boers' last settlement counteroffer and declared it was no longer negotiating, the Board issued the

following prepared Second Statement, which also contained multiple false statements and untrue implications.

76.    The Second Statement included, in part, the following paragraphs:

Of specific concern were the volume, frequency and tone of Dr. Boer's communication with a woman who was not his wife. These concerns were amplified by the power dynamic, considering Dr. Boer's position as President of the University and the woman's role in the community. In his response to the entire Board of Trustees, Dr. Boer characterized those communications as "flirtatious" and "inappropriate." He also reported to Board leadership that he had deleted the messages from his phone knowing they were wrong.

...

The Board has made significant efforts to resolve this matter amicably with Dr. Boer, including offering financial support to both Dr. and Mrs. Boer which exceeds the University's contractual obligation, as well as an offer to assist in relocation from the Manor. Unfortunately, those offers have been refused, though the Board remains open to assisting with the Boers' relocation.

...

We remain confident that Dr. Boer's decision to resign, and the Board's decision to accept his resignation, are in the best interests of all involved. We continue to lament the concern, confusion, and frustration this abrupt transition has caused for some in our community, and we understand that it will take time for all those affected by these events to find healing and restoration. Our thoughts are particularly with the reporting party. We ask that all community members speak and act in a way that is respectful and sensitive to the fact that this individual is a part of our community.

77.    As one example, the above Second Statement mischaracterizes the entirety of what Dr. Boer said to the Board about the text messages.

78.    In another example, the Board's representation in the Second Statement that it offered financial support to the Boers which exceeds its contractual obligation is untrue or – at best – misleading. The Board eventually

21

offered an amount equal to approximately one year of Dr. Boer's salary (which is

contractually required) and an amount for Ms. Boer, but it required that both Boers

accept several onerous settlement provisions in order to receive it, including

complete confidentiality, a prohibition on the Boers defending Dr. Boer publicly or

to anyone privately, and a bar to the Boers from providing other criticisms. The

Board also conditioned the payment on Dr. Boer agreeing to say as part of a joint

statement of the parties that Dr. Boer "admitted" conclusions of the Board's

investigation, which he did not. The Contract requires the Board to pay a year of

compensation to Dr. Boer without giving it the ability to extract these extra

provisions – valuable consideration for Calvin – for no additional compensation.

## COUNT I – Breach of Contract – as to Plaintiff Wiebe Boer

79.     Plaintiffs rely on the allegations of all prior paragraphs, as if they were restated herein.

80.     Dr. Boer's employment contract extended to 2027—a five-year term of employment ("the Contract").

81.     Dr. Boer's employment could be terminated at will, by either party, at any time. For any termination other than "serious misconduct," the University is contractually obligated to provide "salary continuation" for one year.

82.     The Contract defined "serious misconduct" as "a substantive violation in the following areas: fraud or dishonesty; obligations under the University's Covenant for Faculty Members or under the University's policies regarding church membership or Christian Schooling; obligations under the University's policies concerning harassment or consensual relations; conviction of a crime involving an act of moral turpitude; and other misconduct of comparable seriousness and adverse impact on the reputation of the University."

83.     Calvin obtained Dr. Boer's resignation by advising him that it would fire him if he did not agree to resign, *i.e.,* with a threat he was about to be fired, intimidation, and undue time pressure, constituting a constructive termination as a matter of law.

84.     Calvin cannot show a case of "serious misconduct" as defined by the Contract against Dr. Boer.

85.     In constructively terminating him without first properly finding that

he had engaged in "serious misconduct" under the terms of his Contract (which arguably, the Board could not have concluded, and hence the reason the Board instead pushed for his resignation thinking that process could then be avoided), and then refusing to pay him one year of salary continuation without any other requirements, Calvin breached the Contract.

86.     In inducing him to agree to officially resign in exchange for input into Calvin's public statement, and then putting out the Statement while refusing him the input Calvin promised, Calvin further breached a contractual promise it made.

87.     As a result, Plaintiff Wiebe Boer has suffered irreparable harm and damages, and he will continue to suffer such harm unless the relief requested herein is granted.

## RELIEF SOUGHT

WHEREFORE, Plaintiffs request that the Court grant the following relief:

A.     Award Plaintiff front pay in an amount that would fully compensate him for the injuries alleged herein resulting from the unlawful breaches of contract;

B.     Award Plaintiff compensatory damages including damages for mental anguish and emotional distress;

C.     Award Plaintiff exemplary damages;

D.     Award Plaintiff costs and reasonable attorney fees;

E.     Award Plaintiff such other relief as may be just and equitable.

## COUNT II –Violation of the Elliott-Larsen Civil Rights Act – Sex and Race Discrimination as to Plaintiff Joanna Boer

88.     Plaintiffs rely on the allegations of all prior paragraphs, as if they were restated herein.

89.     Defendant violated the Elliott-Larsen Civil Rights Act ("ELCRA"), MCL 37.2101, *et seq.*, when it discriminated against and harassed Plaintiff on account of her sex and race.

90.     Ms. Boer's time working at Calvin was complicated—as she loved the community, was deeply committed to her role on campus, and worked tirelessly for a space based on equality and acceptance for all, but she did not receive the same respect and acceptance in return. Rather, key members of Calvin's administration frequently undermined her, belittled her, and unduly challenged her. Some individuals pushed back on any consideration of race in culture and community at the University.

91.     Ms. Boer was Calvin's first woman of color to serve as the "First Lady."

92.     Many faculty and staff on campus asked Ms. Boer how she was doing since moving to campus. One faculty member warned Ms. Boer that people would think less of Dr. Boer's ability to lead because he was married to a woman of color. Others made comments that it was very brave of her to come to Calvin because it was such a "closed" community.

93.     As part of Ms. Boer's official duties, she was encouraged to redecorate DeWit Manor in her own style.

94.     No work had been done on the home in 10 years, with even older

25

infrastructure, such as a deficient heating system requiring use of space heaters in the home, making it sorely in need of renovations.

95.    Prior presidents did not generally hold social events at the house. The University initially approved of the Boers hosting staff and faculty events in their home. One of the goals of holding these events was to address the low morale on campus that was documented in the workplace survey.

96.    Ms. Boer was not provided financial guidelines for her initiatives. She was just told it would be through the "President's budget," but there was no information provided to her on the budget. Dirk Pruis, Calvin's chief financial officer ("CFO"), eventually told Ms. Boer that she should work with Sharolyn Christians, Dr. Boer's executive assistant, who he said was the "budget officer."

97.    The initial directive to redecorate and host events devolved into petty pushbacks on budget items, such as catering and fixtures. Since there was no budget established that Ms. Boer could work within, Calvin staff regularly and arbitrarily told Ms. Boer that certain expenses, even of a few hundred dollars, were "too much." Ms. Boer was frustrated with the lack of guidelines and inconsistencies.

98.    For example, Ms. Boer wished to replace the outdated bathroom fixtures with pieces that would reflect the school colors. But a modest expense of a few hundred dollars was deemed by CFO Pruis to be far too extravagant. Ms. Boer was frustrated with Pruis' refusal to speak with her directly about these issues when these were the types of matters she was charged with addressing – as a Calvin employee.

99. Ms. Boer felt she was not seen as valid enough to be addressed directly. Prius would not even greet or acknowledge Ms. Boer while attending events in the Boers' home.

100. In an April 2023 board meeting, Ms. Boer addressed the Board to inform them of the status of many projects. After Ms. Boer addressed the Board and left the meeting, Dr. Boer expressed frustration about how his wife was being treated at Calvin.

101. Eventually, Prius gave Christians, Dr. Boer's executive assistant, the authority to approve Ms. Boer's expenditures on events and home purchases. Christians was very short and abrasive with Ms. Boer, and frequently admonished Ms. Boer that she had to approve all expenditures. She micromanaged Ms. Boer's efforts as Pruis' delegate and seemed to resent Ms. Boer.

102. In or about September 2023, Pruis continued to micromanage Ms. Boer without directly coming to her. Pruis would not allow Ms. Boer to lead projects that Calvin assigned to her as her responsibility. So Ms. Boer asked to meet with Pruis to try and resolve the issue. Pruis came to DeWit Manor for the conversation.

103. Pruis informed Ms. Boer that he found a University reception for two faculty of color who recently married that she planned to be "incredibly inappropriate."

104. The reception was a gathering of staff and faculty on a Wednesday afternoon. It was held to celebrate the love that two members of Calvin faculty had found and also to improve morale on campus. To Ms. Boer's knowledge, there had

never been faculty of color who married while employed at Calvin. She felt this should be celebrated in addition to the general joy of the marriage.

105.    Typically, professors and faculty of color at Calvin have reported feeling on the margins of the community. Ms. Boer planned the event in the same spirit as the monthly faculty luncheons, and it cost less than one of the monthly luncheons, with more people included, because there was no sit-down meal.

106.    Pruis asked Ms. Boer, "Are you going to give a reception like this for every pair of faculty members who marry?" Ms. Boer replied that of course she would.

107.    As Pruis continued to push back about the cost and the optics of the event, Ms. Boer asked him, "what about Christianity?" Pruis responded, "What about justice?" Ms. Boer replied that Pruis needed to trust that she and Wiebe Boer knew what they were doing, and that this was a celebratory event that provided a wonderful morale-building opportunity on campus.

108.    Pruis, now becoming very frustrated, told Ms. Boer, "This is where I will get very mean." In an attempt to limit the aggressive nature of Pruis' discussion, Ms. Boer said, "I think we will just need to agree to disagree."

109.    When Pruis left the Boers' home that day, he told Ms. Boer, "I want to give you a piece of advice. While you are here, you really should just focus on your kids."

110.    Ms. Boer could not believe that Pruis spoke to her in this condescending and discriminatory way. Ms. Boer also did not think that Pruis

28

would have spoken to her in that manner if her husband was present.

111.    In communications with Ms. Boer, Pruis was always slow to respond, and then condescending. Pruis always doublechecked what Ms. Boer told him.

112.    In or around October 2023, Ms. Boer was at a business event with Pruis and the other members of the President's cabinet. Ms. Boer and Pruis were walking to the library for the next event. Pruis came behind Ms. Boer and put his hand on the small of her back. Pruis said, "Wow, you look so glamourous with your big sunglasses."

113.    Ms. Boer was taken aback by Pruis' intimate contact and comments on her appearance. Again, Ms. Boer did not think that Pruis would talk to her or touch her this way if her husband was around.

114.    Dr. Boer went to Calvin's Chief Diversity Officer ("CDO"), Nygil Likely, with his concerns about how Ms. Boer was being treated, but did not identify Pruis and Christians. Likely then guessed that Pruis and Christians were who Dr. Boer was speaking to him about, without Dr. Boer disclosing that fact. Dr. Boer recommended that Pruis and Christians each undergo diversity training.

115.    Shortly thereafter, in December 2023, Ms. Boer made a complaint directly to Likely regarding the belittling and discriminatory behavior from Pruis.

116.    CDO Likely acknowledged that Pruis had an issue with how he spoke to people of color. Likely said he had witnessed the same sort of things Ms. Boer was complaining about.

117.    Feeling like she was being heard for the first time by Calvin, Ms. Boer

felt relieved. When asked if she wanted Pruis and Christians to undergo diversity training, Ms. Boer declined. She did not want to upset the balance of the cabinet or create resentment towards her and Dr. Boer.

118.    In January 2024, Ms. Boer met with Board Vice Chair Mary Tuuk Kuras. Ms. Boer told Kuras what Pruis had said to her previously. Kuras seemed shocked that Pruis would speak to her that way. Ms. Boer told Kuras that Dr. Boer said this could be a complaint to refer to the "Safer Spaces" office. Kuras did not respond.

119.    In the January 2024 Board meeting, Ms. Boer presented on events and other initiatives. For employment purposes, Ms. Boer reported to Board Chair Los as her supervisor. Los then delegated supervision of Ms. Boer to Greg Elzinga, Vice President of Development. Ms. Boer told Mr. Elzinga that she was having a very hard time in her role because of the lack of policies and budget for the tasks she was assigned to carry out, plus the attitude of Pruis and Christians. Mr. Elzinga said he would speak to Los about this. But Ms. Boer never received any follow-up.

120.    Ms. Boer then met with Board Secretary Miyamoto after Dr. Boer reached out to him and asked Miyamoto to address her concerns. Dr. Boer always tried to have University employees other than himself involved in Ms. Boer's projects to avoid the appearance of a conflict of interest and preferential treatment.

121.    Miyamoto told Ms. Boer that although he is Asian, most people at Calvin consider him white, and he "really doesn't get the diversity issue." Miyamoto asked Ms. Boer to explain what her issue was, which she did.

122.    Nothing happened as a result of that meeting with Miyamoto. Ms. Boer's struggles with Pruis and Christians continued.

123.    The Boers were the first interracial couple in DeWit Manor, which led to hyper-focus and attention on many of their activities compared with previous presidents.

124.    Calvin treated Ms. Boer differently than it did similarly situated employees of other races in the terms and conditions of her employment, including permitting greater discretion to those employees in shaping an agenda on campus and directing events.

125.    Calvin treated Ms. Boer differently than it did male employees in the terms and conditions of her employment, including limiting her ability to execute her duties; refusing to give her necessary direction, budget, or policies to guide her; and valuing her appearance over her work.

126.    Ms. Boer has suffered irreparable harm and damages, in that she has been unlawfully terminated as aforesaid, and suffered financial losses as a result. She will continue to suffer such harm unless the relief requested herein is granted.

## RELIEF SOUGHT

WHEREFORE, Plaintiff Joanna Boer requests that the Court grant the following relief:

A.    Award Plaintiff economic damages in an amount designed to make his whole, and replace that which was denied or lost by reason of violations of ELCRA by Defendant;

B.    Award Plaintiff compensatory damages for mental anguish and emotional distress;

C.    Award Plaintiff exemplary damages;

D.    Award Plaintiff costs and reasonable attorney fees;

E.    Award Plaintiff such other relief as may be just and equitable.

## COUNT III – Defamation – as to Plaintiff Wiebe Boer

127.    Plaintiffs rely on the allegations of all prior paragraphs, as if they were restated herein.

98.    Calvin's agents made false and defamatory statements about Dr. Boer to the Calvin community and the public at large in the Statement and the Second Statement (collectively, "the Statements") that Calvin officials issued.

99.    Calvin intentionally painted Dr. Boer in a false light when its agents issued the Statements. Calvin officials made intentional misstatements and misleading intimations in the Statements in order to accomplish what Calvin's officials saw as a benefit to Calvin: to attempt to boost public opinion for its decision and to attempt to limit questions about why it constructively discharged Dr. Boer – all to the great detriment and damage to Dr. Boer.

100.    Calvin painted Dr. Boer in a false light and stated intentional falsehoods in the Statements with actual malice toward him and his reputation.

101.    The falsehoods in the Statements caused special harm to Dr. Boer because they were made to the Calvin community, which included Dr. Boer's colleagues and fellow alumni, as well as donors with whom he had worked during

his presidency.

102.    The Statement was published by many media outlets, including local and national news outlets, and those focused on religion and higher education.

103.    Through its publication to the Calvin community and its subsequent publication in numerous media outlets, the Statements damaged Dr. Boer's professional reputation and future professional opportunities.

104.    Calvin defamed Plaintiff when its agents committed the acts as aforesaid.

105.    Plaintiff has suffered irreparable harm and damages in that he has been unlawfully defamed in the Calvin community and national religious and academic circles.

## RELIEF SOUGHT

WHEREFORE, Plaintiffs request that the Court grant the following relief:

A.    Award Plaintiff damages equal to any salary, wages, bonuses, employment benefits and/or other compensation denied or lost to him by reason of defamation by Defendant, plus interest;

B.    Award Plaintiff compensatory damages including damages for mental anguish and emotional distress;

C.    Award Plaintiff exemplary damages and/or punitive damages;

D.    Award Plaintiff costs and reasonable attorney fees.

PINSKY SMITH, PC
Attorneys for Plaintiff Wiebe Boer

Dated: April 12, 2024          By:_____ */s/ Sarah R. Howard*_____
                                        Sarah Riley Howard
                                        Crystal J. Bultje
                                        146 Monroe Center St NW, Suite 418
                                        Grand Rapids, MI 49503
                                        (616) 451-8496
                                        showard@pinskysmith.com
                                        cbultje@pinskysmith.com


CUNNINGHAM DALMAN, PC
Attorneys for Plaintiff Joanna Boer

Dated: April 12, 2024          By:_____ */s/ Robert M. Howard*_____
                                        Robert M. Howard, II
                                        940 Monroe Ave NW, Suite 253
                                        Grand Rapids, MI 49503
                                        (616) 451-8496
                                        robert@cunninghamdalman.com

## <u>JURY DEMAND</u>

To the extent that jury trial is available as to any of the issues set forth above, Plaintiffs hereby demand same.

PINSKY SMITH, PC
Attorneys for Plaintiff Wiebe Boer


Dated: April 12, 2024        By:_____*/s/ Sarah R. Howard*_____
                                                        Sarah Riley Howard
                                                        Crystal J. Bultje (P80276)
                                                        146 Monroe Center St NW, Suite 418
                                                        Grand Rapids, MI 49503
                                                        (616) 451-8496
                                                        showard@pinskysmith.com
                                                        cbultje@pinskysmith.com


CUNNINGHAM DALMAN, PC
Attorneys for Plaintiff Joanna Boer


Dated: April 12, 2024        By:_____*/s/ Robert M. Howard*_____
                                                        Robert M. Howard, II (P80740)
                                                        940 Monroe Ave NW, Suite 253
                                                        Grand Rapids, MI 49503
                                                        (616) 451-8496
                                                        robert@cunninghamdalman.com