# EXHIBIT A

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (the "Agreement") is entered into effective June 27, 2022 (the "Effective Date"), by and between Calvin University (the "University") and Wiebe Boer, Ph.D. ("Dr. Boer" or the "President").

### Background Information

The University Board of Trustees conducted a comprehensive global search process for the 11th president in the University's history. Based on the results of this comprehensive search and evaluation of qualified candidates, the University desires to employ Dr. Boer and Dr. Boer desires to serve as the President. The purpose of this Agreement is to set forth the terms and conditions for Dr. Boer's service as President of the University.

### Terms and Conditions

NOW, THEREFORE, the parties, intending to be legally bound, hereby agree as follows:

1.      *Employment.* The University agrees to employ Wiebe Boer, Ph.D. and Dr. Boer accepts employment as President of the University. During his term of employment (as defined in Section 1.1), the President shall perform such duties for and render such services to the University as are customary and incidental to the position of President, or such other duties or services as may be from time to time assigned to him by the University's Board of Trustees (the "Board") and which are consistent with such a position. The President shall report and be accountable exclusively to the Board. The President agrees to use his best efforts to carry out his duties and responsibilities under this Agreement and to devote substantially all of his business time, attention, and energy thereto.

1.1      *Term of Employment.* The term of employment shall commence June 27, 2022, and end on June 30, 2027 (the "Term"). It is the intention of the parties that the University will conduct a comprehensive assessment of the President's performance during the 2025-2026 academic year and initiate discussions about whether the parties wish to enter an employment agreement for the period beyond June 30, 2027.

1.2      *Compensation.* For all the services rendered by the President hereunder, the University shall pay the President as follows:

(a)      *Base Salary.* The University will provide a Base Salary at the annual rate of $400,000, payable in installments at such times as the University customarily pays its other administrative faculty. The University Board of Trustees Executive Committee shall conduct an annual review of the President's performance based in part upon prior mutually agreed upon goals. The Board of Trustees Executive Compensation Committee shall conduct a review of the President's compensation consistent with Board Policies and the University's compensation philosophy. Based upon these reviews, the President may be awarded an increase in his Base Salary.

(b) *Signing Bonus.* The University will pay Dr. Boer a signing bonus of $100,000 during June 2022. The signing bonus will be subject to all required tax withholdings.

(c) *Short-Term Incentive Pay.* The University will establish a Short-Term Incentive Plan under which Dr. Boer may earn an annual award for a University Fiscal Year ("Fiscal Year") based upon achieving or exceeding performance goals related to enrollment, profitability, and fundraising as established by the Board of Trustees for that Fiscal Year. The annual award will be paid as a cash bonus as soon as administratively feasible after the Fiscal Year end date. The cash bonus opportunity, or annual award, will be valued at 25% of Dr. Boer's annual base salary with a multiplier range of 0% - 200% and will be awarded based on meeting and exceeding performance goals established by the Board of Trustees. For example, the annual cash award opportunity for the Fiscal Year ending June 30, 2023 will range from $0 to $200,000.

(d) *Long-Term Incentive Pay.* The University will also establish a Long-Term Incentive Plan under which Dr. Boer may earn an annual award for a Fiscal Year based upon achieving or exceeding performance goals related to enrollment, profitability, and fundraising as established by the Board of Trustees for that Fiscal Year period. The annual award will be credited to Dr. Boer's account in a deferred compensation plan under Section 457(f) of the Internal Revenue Code ("Code"). Dr. Boer will vest in this annual award if he is employed by the University on the first day of the fourth Fiscal Year beginning after the Fiscal Year in which the annual award is earned. For example, the annual award for the Fiscal Year ending June 30, 2023 will vest if Dr. Boer is employed by the University on July 1, 2026. Further, Dr. Boer will vest in any nonvested annual awards on July 1, 2027 if the Board, in its discretion, does not extend Dr. Boer's employment as President of the University after June 30, 2027. The vested benefit will be paid as soon as administratively feasible after the vesting date, and will be subject to all required tax withholdings.

1.3 *Benefits.* The University shall provide the President the following benefits:

(a) *Relocation Expenses.* The University will pay for all reasonable and customary relocation expenses related to Dr. Boer's move of family household goods.

(b) *Health Insurance.* The University will provide health insurance including medical, dental and prescription coverage for the President and his eligible family members pursuant to the University's health insurance benefit plan made available to the University's employees and administrative faculty which may be in effect from time to time and subject to the eligibility requirements of such plan. Nothing in this Agreement shall prevent the University from amending or terminating any health insurance benefit plan as the University deems appropriate.

(c) *Life Insurance.* During the Term, the University shall provide the President with Group Life Insurance in the amount of $100,000 pursuant to the plan or program applicable to the University's employees and administrative faculty which may be in effect from time to time and subject to the eligibility requirements of such plans. In addition,



during the Term, the University will pay the premium on a life insurance policy in the amount of Two Million Dollars ($2,000,000.00).  The President shall designate the beneficiary(ies) of the life insurance policies.

(d)    *Disability Insurance.*  During the Term, the University shall provide the President with Long Term Disability Insurance pursuant to the disability plan or program applicable to the University's employees and administrative faculty which may be in effect from time to time and subject to the eligibility requirements of such plan.  In addition, during the Term, the University will pay the premium on a Supplemental Individual Disability Insurance policy in accordance with the policy's defined benefit and associated riders.  The President shall designate the beneficiary(ies) of the disability policies.

(e)    *Automobile.*  During the Term, the University shall provide the President with a university owned vehicle.  The University will provide insurance, gas and maintenance of the vehicle.

(f)    *Retirement Benefit.*  The University will contribute an amount equal to six percent (6%) of the President's Base Salary to a retirement plan sponsored by the University.  The University will also provide up to a two percent (2%) match on the President's own contributions to the retirement plan. However, under the Code, there is a limit on the amount of compensation that may be counted in determining the amount of the University's contributions.  This dollar limit is $305,000 during 2022, and is adjusted annually for increases in the cost-of-living.  To the extent that the University's contributions are reduced because of the dollar limit on compensation, the amount of reduction will be credited to Dr. Boer's account in a separate deferred compensation plan under Section 457(f) of the Code.  These amounts will vest if Dr. Boer is employed by the University until June 30, 2027.  The vested benefit will be paid as soon as administratively feasible after the vesting date, and will be subject to all required tax withholdings.

(g)    *Travel and Related Expenses.*    The President shall be entitled to reimbursement of reasonable and documented expenses related to his employment by the University on the same basis as other administrative faculty.  All airline travel will be in accordance with the University's travel policy.  For flights that exceed four (4) hours in the air, the President is authorized to fly and be reimbursed for business class so long as the purpose of such travel is in furtherance to his duties as the University's President.  The President's spouse is also authorized to fly and be reimbursed for business class when she travels with the President on flights that exceed four (4) hours in the air so long as she is doing so in furtherance of her duties as Special Assistant to the President.

(h)    *Vacation.*  During the Term, the President shall be entitled to thirty (30) days of paid vacation per year.

(i)    *Tuition Allowance.*  The University shall pay an amount equal to one hundred percent (100%) of Calvin's tuition towards the tuition of the President's children at post-secondary educational institutions of their choosing for a maximum of four (4) years. Additionally, the University will provide the President with a tution allowance for his dependent's K-12 Christian school education equal to 20% of the annual tuition rate.



(j)      *Workers Compensation, Social Security Contribution and Unemployment Compensation.*  During the Term, the University shall provide the President with the University's workers compensation and unemployment compensation coverage and shall make social security contributions consistent with applicable law.

1.4      *Housing.*  The President is obliged, and the President has agreed as a condition of his employment, and as a benefit to the University, to reside during the Term at DeWit Manor (the "Presidential Residence").  The University shall pay all utilities, taxes, insurance, and expenses of maintenance and upkeep for the Presidential Residence.  The University also agrees to pay for expenses related to basic refreshing and repurposing of the Manor (e.g., paint and carpet refresh in bedrooms and the outfitting of additional basement bedrooms) to meet family needs. It is understood between the parties that the Presidential Residence shall be used for University-related business and entertainment purposes on a reasonable and continuing basis and that all costs associated with such entertainment shall be borne by the University.

1.5      *Board Service, Public Speaking, and Other Outside Activities.*  The Board permits the President to engage in outside activities such as serving on for-profit and non-profit boards of directors, delivering speeches, writing, and consulting services to the extent these outside activities do not interfere with the performance of his obligations contained herein and are consistent with the University Conflict of Interest Policy.  The President's participation on either a non-profit or a for-profit board must be approved in advance by the Board and will be in the Board's discretion. If the Board subsequently determines that any previously-approved outside activities pose or will pose a "conflict of interest" (as defined in the University Conflict of Interest Policy), or if the time commitments required of the President by the outside activities interfere with the performance of his obligations hereunder, the President shall, at the request of the Board, cease such activities at the earliest available opportunity.  Any compensation earned by the President in connection with approved outside activities may be paid to and retained by him, and will not affect the terms of this Agreement.  The President agrees to promptly disclose to the Board each new recurring source of outside earned income and other compensation.  The President agrees to disclose annually to the Board's Executive Compensation Committee the source and amounts of all outside income.

1.6      *Spousal Employment.*  The University agrees to work with Joanna Boer, the President's spouse, to create a separate position and role that aligns with her skills, experiences, and Calvin's needs.

2.      *Termination.*  The President's employment shall terminate upon the occurrence of any of the following events:

2.1      *Termination At Will.*  The University is an "at will" employer.  Both the President and the University have the right to terminate the employment relationship at any time and for any reason.  However, if prior to June 30, 2027, the University terminates the President's employment for a reason other than "serious misconduct," the University will provide "salary continuation" payments in an amount equal to one (1) year of the President's Base Salary as of the time of termination.  These payments are contingent upon execution by the President of an Agreement releasing any and all claims against the University and shall be made on the University's regular payroll schedule unless otherwise mutually agreed upon by the President and the University.  All such payments shall be subject to normal payroll deductions.  The University will continue health

4



insurance coverage, including dental and prescription coverage for the President and his eligible family members for the lesser of: (1) the period of salary continuation, or (2) the date upon which the President obtains equivalent coverage from a subsequent employer.

For purposes of this paragraph, "serious misconduct" means a substantive violation in the following areas: fraud or dishonesty; obligations under the University's Covenant for Faculty Members or under the University's policies regarding church membership or Christian Schooling; obligations under the University's policies concerning harassment or consensual relations; conviction of a crime involving an act of moral turpitude; and other misconduct of comparable seriousness and adverse impact on the reputation of the University.

2.2 *Voluntary Termination.* In the event the President shall voluntarily terminate his employment prior to the end of the term of this Agreement, he is asked to give not less than one (1) years' notice in order to transition the duties and responsibilities of his position. Upon such termination, the President shall be entitled to any accrued but unpaid Base Salary and benefits. The President shall not be entitled to any severance pay in the event the President voluntarily terminates his employment.

2.3 *Disability.* The University may terminate the President's employment if the President is unable to perform the essential functions of his position with or without reasonable accommodation during the Term because of physical or mental injury or illness ("Disability"), subject to any limitations imposed by federal, state or local laws. The University will provide a reasonable accommodation to the President with a disability as defined by the federal Americans with Disabilities Act and applicable state or local laws, if such reasonable accommodation would not impose an undue hardship to the University and would enable the President to satisfactorily perform the essential functions of the position. During any approved Disability leave, the University shall pay the President's Base Salary pursuant to the University's short-term disability policies. If the President remains unable to perform the essential functions of his job after exhaustion of the short-term disability benefit, any further approved Disability leave shall be unpaid leave but the President may be eligible for long-term disability insurance payments as determined by the applicable long-term disability insurance policy. The President agrees, in the event of a dispute under this Section 2.3 relating to the President's Disability, to submit to a physical examination by a licensed physician jointly selected by the Board and the President. If the University terminates the President's employment for Disability, the President shall be entitled to receive the following:

(a) Within thirty (30) days of such termination, the University shall pay to the President, as a lump sum, all amounts earned or accrued, under Section 1.2, that had not yet been paid as of the date of termination; and

(b) The President shall receive all other benefits accrued or earned in accordance with the terms of any applicable benefit plans and programs of the University through the date of his termination. The President shall not be entitled to any severance pay in the event he is terminated for Disability.

2.4 *Death.* If the President dies while employed by the University, the University shall pay to the President's executor, legal representative, administrator or designated beneficiary, as

5



applicable, all amounts earned or accrued, under Section 1.2 above, that had not yet been paid as of the date of his death.  The President's family shall be entitled to remain in the Presidential Residence for a period of at least ninety (90) days, but no more than one hundred twenty (120) days.  Except as otherwise set forth above, the University shall have no further liability or obligation under this Agreement to the President's executors, legal representatives, administrators, heirs or assigns or any other person claiming under or through the President, including (but not limited to) no liability for any severance pay.

3.    *Survivorship.*  The respective rights and obligations of the parties under this Agreement shall survive any termination of the President's employment to the extent necessary to the intended preservation of such rights and obligations.

4.    *Notices.*  All notices and other communications required or permitted under this Agreement or necessary or convenient in connection herewith shall be in writing and shall be deemed to have been given when hand delivered or mailed by registered or certified mail, as follows (provided that notice of change of address shall be deemed given only when received):

If to the University, to:

Chair,
Calvin University Board of Trustees
3201 Burton St SE,
Grand Rapids, MI 49546

If to the President, to:

Wiebe Boer, Ph.D.
De Wit Manor
Calvin University
3215 Burton St SE,
Grand Rapids, MI 49546

or to such other names or addresses as the University or the President, as the case may be, shall designate by notice to each other person entitled to receive notices in the manner specified in this Section 5.

5.    *Contents of Agreement; Amendment and Assignment.*  This Agreement sets forth the entire understanding between the parties hereto with respect to the subject matter hereof and cannot be changed, modified, extended or terminated except upon written amendment approved by the Board and executed on its behalf by a duly authorized member of the Board and by the President.  All of the terms and provisions of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective heirs, executors, administrators, legal representatives, successors, and assigns of the parties hereto, except that the duties and responsibilities of the President under this Agreement are of a personal nature and shall not be assignable or delegable in whole or in part by the President.



6.      *No Conflicting Agreements.*  The President represents and warrants that the President is free to enter into and perform this Agreement and the agreements referred to herein and that the President is not a party to any existing agreement which would prevent the President from entering into and performing this Agreement.

7.      *Severability.*  If any provision of this Agreement or application thereof to anyone or under any circumstances is adjudicated to be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability shall not affect any other provision or application of this Agreement which can be given effect without the invalid or unenforceable provision or application and shall not invalidate or render unenforceable such provision or application in any other jurisdiction.  If any provision is held void, invalid or unenforceable with respect to particular circumstances, it shall nevertheless remain in full force and effect in all other circumstances.

8.      *No Waiver of Remedies.*  No delay or omission by a party in exercising any right, remedy or power under this Agreement or existing at law or in equity shall be construed as a waiver thereof, and any such right, remedy or power may be exercised by such party from time to time and as often as may be deemed expedient or necessary by such party in its sole discretion.

9.      *Beneficiaries/References.*  The President shall be entitled, to the extent permitted under any applicable law, to select and change a beneficiary or beneficiaries to receive any compensation or benefit payable under this Agreement following the President's death by giving the University written notice thereof.  In the event of the President's death or a judicial determination of the President's incompetence, reference in this Agreement to the President shall be deemed, where appropriate, to refer to the President's beneficiary, estate or other legal representative, as appropriate.

10.     *Miscellaneous.*  All section headings used in this Agreement are for convenience only. This Agreement may be executed in counterparts, each of which is an original.  It shall not be necessary in making proof of this Agreement or any counterpart hereof to produce or account for any of the other counterparts.

11.     *Withholding.*  All payments under this Agreement shall be made subject to applicable tax withholding, and the University shall withhold from any payments under this Agreement all federal, state, and local taxes as the University is required to withhold pursuant to any law or governmental rule or regulation.  The President shall be solely responsible for all federal, state, and local taxes due with respect to any payment received under this Agreement.

12.     *Governing Law, Jurisdiction and Venue.*  This Agreement shall be governed by and interpreted under the laws of the State of Michigan.  For any action arising out of this agreement, the President and the University submit to jurisdiction and with venue proper in the Kent County Circuit Court in the State of Michigan or the United States District Court for the Western District of Michigan.

13.     *Section 409A of the Internal Revenue Code.*  Notwithstanding anything herein or in the Contract to the contrary, no payments will be made or benefits provided under this Amendment or the Contract in violation of Section 409A(2)(b)(i) of the Internal Revenue Code of 1986 (the "Code").  The University will adopt such amendments to this Agreement as are necessary or

7

appropriate to exempt the payments or benefits from Section 409A of the Code or to modify such payments or benefits in a manner that maintains the value of this Agreement to you to the maximum extent possible while remaining in compliance with Section 409A of the Code.

14.     *Attestation.* The President understands the University's interest in, and need to conduct, a thorough background check, including a criminal background check.  The parties mutually acknowledge the difficulty of securing reliable criminal background results for the period the President has spent living in Nigeria; therefore, with his signature, the President attests to the fact that he has not been convicted of any crime in Nigeria, and that no charges are pending against him in Nigeria for any offense that would constitute a felony under Michigan law.

        IN WITNESS WHEREOF, the undersigned, intending to be legally bound, have voluntarily executed this Agreement as of the date first above written.


PRESIDENT                                          CALVIN UNIVERSITY

By: _____  25 March, 2022   By: _____  4/6/22
        Wiebe Boer, Ph.D.                             Bruce Los
                                                      Title: Chair, Board of Trustees

8

MJ_DMS 34467157v1